1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

| | |
|---|---|
| LUE YANG, ) | Case No. EDCV 08-1447 JC |
| Plaintiff, ) | |
| ) | MEMORANDUM OPINION AND |
| v. ) | ORDER OF REMAND |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| Defendant. ) | |
| _____ ) | |

18
19

**I.    SUMMARY**

20
21
22
23

On October 23, 2008, plaintiff Lue Yang ("plaintiff") filed a Complaint seeking review of the Commissioner of Social Security's denial of plaintiff's application for benefits.  The parties have filed a consent to proceed before a United States Magistrate Judge.

24
25
26
27
28

This matter is before the Court on the parties' cross motions for summary judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion").  The Court has taken both motions under submission without oral argument.  See Fed. R. Civ. P. 78; L.R. 7-15; October 28, 2008 Case Management Order ¶ 5.
///

1

1    Based on the record as a whole and the applicable law, the decision of the

2    Commissioner is REVERSED AND REMANDED for further proceedings

3    consistent with this Memorandum and Opinion and Order of Remand because the

4    Administrative Law Judge ("ALJ") erred in rejecting Plaintiff's treating

5    physician's opinion.

6    **II.   BACKGROUND AND SUMMARY OF ADMINISTRATIVE**

7    **DECISION**

8        On or about October 5, 2005, plaintiff filed an application for Supplemental

9    Security Income benefits.  (Administrative Record ("AR") 45-51).  Plaintiff, who

10   cannot speak, read or understand English, has a second grade education, and has

11   never worked, asserted that he became disabled on September 1, 2005, due to

12   myositis and depression.[1]  (AR 45, 77, 78, 82).  The Social Security

13   Administration denied plaintiff's application initially and on reconsideration.  (AR

14   32-44).  Plaintiff requested a hearing, which an ALJ conducted on July 25, 2008.

15   (AR 29, 233-52).   The ALJ examined the medical record and heard testimony

16   from plaintiff (who was represented by counsel), plaintiff's wife, and a vocational

17   expert.  (AR 233-52).

18       On August 11, 2008, the ALJ determined that plaintiff was not disabled

19   through the date of the decision.  (AR 11-17).  Specifically, the ALJ found:

20   (1) plaintiff suffered from the following severe impairment:  idiopathic

21   intermittent hypokalemia[2] (AR 13); (2) plaintiff's impairments, considered singly

22   or in combination, did not meet or medically equal a listed impairment (AR 13);

23

24

25       [1]"Myositis" per Merriam-Webster's Online Medical Dictionary (2009), refers to
     "muscular discomfort or pain from infection or an unknown cause."  See http://www.merriam-
26   webster.com/medical/myositis (last visited Oct. 15, 2009).

27       [2]"Hypokalemia" is a "deficiency of potassium in the blood."  See http://www.merriam-
     webster.com/medical/hypokalemia.  "Idiopathic" means "arising spontaneously or from an
28   obscure or unknown cause."  See http://www.merriam-webster.com/medical/idiopathic (last
     visited Oct. 15, 2009).

1  (3) plaintiff retained the residual functional capacity to perform sedentary work[3]

2  (AR 13); (4) plaintiff has no past relevant work (AR 16); (5) there are jobs that

3  exist in significant numbers in the national economy that plaintiff could perform

4  (AR 16-17); and (6) plaintiff's allegations regarding his limitations were not

5  entirely credible (AR 14-15).

6     The Appeals Council denied plaintiff's application for review.  (AR 4-6).

7  **III.   APPLICABLE LEGAL STANDARDS**

8     **A.   Sequential Evaluation Process**

9     To qualify for disability benefits, a claimant must show that he is unable to

10  engage in any substantial gainful activity by reason of a medically determinable

11  physical or mental impairment which can be expected to result in death or which

12  has lasted or can be expected to last for a continuous period of at least twelve

13  months.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing 42 U.S.C.

14  § 423(d)(1)(A)).  The impairment must render the claimant incapable of

15  performing the work he previously performed and incapable of performing any

16  other substantial gainful employment that exists in the national economy.  Tackett

17  v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

18     In assessing whether a claimant is disabled, an ALJ is to follow a five-step

19  sequential evaluation process:

20     (1)   Is the claimant presently engaged in substantial gainful activity?  If

21        so, the claimant is not disabled.  If not, proceed to step two.

22  ///

23  _____

24     [3]Sedentary work involves lifting no more than 10 pounds at a time and occasionally
lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is

25  defined as one which involves sitting, a certain amount of walking and standing is often
necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required

26  occasionally and other sedentary criteria are met.  20 C.F.R § 416.967(a).  The ALJ determined
that plaintiff could lift up to 10 pounds frequently and up to 20 pounds occasionally, could

27  occasionally climb, balance, stoop, crouch or crawl, is precluded from climbing ladders, ropes or
scaffolds, and needs to avoid all workplace hazards, including machinery and heights.  (AR 13).

28  The ALJ also found that plaintiff cannot speak, read or write English.  (AR 13).

(2)    Is the claimant's alleged impairment sufficiently severe to limit his ability to work?  If not, the claimant is not disabled.  If so, proceed to step three.

(3)    Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is disabled.  If not, proceed to step four.

(4)    Does the claimant possess the residual functional capacity to perform his past relevant work?[4]  If so, the claimant is not disabled.  If not, proceed to step five.

(5)    Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow him to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1052 (9th Cir. 2006) (citing 20 C.F.R. §§ 404.1520, 416.920).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); see also Burch, 400 F.3d at 679 (claimant carries initial burden of proving disability).

**B.    Standard of Review**

Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error.  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006) (citing Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1457

---

[4]Residual functional capacity is "what [one] can still do despite [ones] limitations" and represents an "assessment based upon all of the relevant evidence."  20 C.F.R. § 416.945(a).

4

1  (9th Cir. 1995)).  Substantial evidence is "such relevant evidence as a reasonable
2  mind might accept as adequate to support a conclusion."  Richardson v. Perales,
3  402 U.S. 389, 401 (1971) (citations and quotations omitted).  It is more than a
4  mere scintilla but less than a preponderance.  Robbins, 466 F.3d at 882 (citing
5  Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990)).

6      To determine whether substantial evidence supports a finding, a court must
7  "'consider the record as a whole, weighing both evidence that supports and
8  evidence that detracts from the [Commissioner's] conclusion.'"  Aukland v.
9  Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting Penny v. Sullivan, 2 F.3d
10 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming
11 or reversing the ALJ's conclusion, a court may not substitute its judgment for that
12 of the ALJ.  Robbins, 466 F.3d at 882 (citing Flaten, 44 F.3d at 1457).

13 **IV.  DISCUSSION**

14     Plaintiff complains, *inter alia*, that the ALJ failed properly to consider the
15 treating physician opinion of Dr. Muhammad Akhtar in assessing plaintiff's
16 residual functional capacity.  (Plaintiff's Motion at 2-3).  As detailed more fully
17 below, Dr. Akhtar found that plaintiff had limitations greater than those the ALJ
18 found to exist.  Plaintiff now challenges the sufficiency of the reasons the ALJ
19 gave in rejecting Dr. Akhtar's more limited residual functional capacity
20 determination.  For the reasons that follow, this Court finds that the ALJ erred in
21 rejecting Dr. Akhtar's opinion.

22     **A.    The ALJ Failed to Provide Sufficient Reasons for Rejecting the**
23        **Treating Physician's Residual Functional Capacity Assessment**
24        **1.    Pertinent Law**
25     In Social Security cases, courts employ a hierarchy of deference to medical
26 opinions depending on the nature of the services provided.  Courts distinguish
27 among the opinions of three types of physicians:  those who treat the claimant
28 ("treating physicians") and two categories of "nontreating physicians," namely

1    those who examine but do not treat the claimant ("examining physicians") and

2    those who neither examine nor treat the claimant ("nonexamining physicians").

3    Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995), as amended (1996) (footnote

4    reference omitted).  A treating physician's opinion is entitled to more weight than

5    an examining physician's opinion, and an examining physician's opinion is

6    entitled to more weight than a nonexamining physician's opinion.[5]  See id.  In

7    general, the opinion of a treating physician is entitled to greater weight than that of

8    a nontreating physician because the treating physician "is employed to cure and

9    has a greater opportunity to know and observe the patient as an individual."

10   Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 600

11   (9th Cir. 1999) (citing Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)).

12        The treating physician's opinion is not, however, necessarily conclusive as

13   to either a physical condition or the ultimate issue of disability.  Magallanes v.

14   Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citing Rodriguez v. Bowen, 876 F.2d

15   759, 761-62 & n.7 (9th Cir. 1989)).  Where a treating physician's opinion is not

16   contradicted by another doctor, it may be rejected only for clear and convincing

17   reasons.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citation and internal

18   quotations omitted).  The ALJ can reject the opinion of a treating physician in

19   favor of a conflicting opinion of another examining physician if the ALJ makes

20   findings setting forth specific, legitimate reasons for doing so that are based on

21   substantial evidence in the record.  Id. (citation and internal quotations omitted);

22   Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ can meet burden by

23   setting out detailed and thorough summary of facts and conflicting clinical

24   evidence, stating his interpretation thereof, and making findings) (citations and

25   quotations omitted); Magallanes, 881 F.2d at 751, 755 (same; ALJ need not recite

26

27        [5]Cf. Le v. Astrue, 529 F.3d 1200, 1201-02 (9th Cir. 2008) (not necessary or practical to
28   draw bright line distinguishing treating physicians from non-treating physicians; relationship is
     better viewed as series of points on a continuum reflecting the duration of the treatment
     relationship and frequency and nature of the contact) (citation omitted).

1    "magic words" to reject a treating physician opinion – court may draw specific and

2    legitimate inferences from ALJ's opinion).  However, "[t]he ALJ must do more

3    than offer his conclusions."  Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.

4    1988).  "He must set forth his own interpretations and explain why they, rather

5    than the [physician's], are correct."  Id.  "Broad and vague" reasons for rejecting

6    the treating physician's opinion do not suffice.  McAllister v. Sullivan, 888 F.2d

7    599, 602 (9th Cir. 1989).[6]

8                    **2.    The Medical Record**

9            The medical record documenting plaintiff's limitations is not extensive.

10   Plaintiff lived most of his life in a refugee camp in Thailand before coming to the

11   United States in 2005.  (AR 120).  Plaintiff was seen by Dr. Akhtar on August 9,

12   2005, for complaints of generalized weakness.  (AR 95).  Plaintiff reported

13   suffering from muscle weakness since age 10.  (AR 95).  Dr. Akhtar ordered

14   testing and referred plaintiff for a neurological evaluation, and noted to rule out

15   muscular dystrophy and myasthenia gravis.[7]  (AR 95).  A summary of plaintiff's

16   blood tests done at the time, noted plaintiff had a mildly elevated white blood cell

17   count and other "abnormal laboratory data."  (AR 118; se also AR 98-101 (lab

18   reports)).  Dr. Akhtar's working diagnosis was muscular dystrophy.  (AR 104,

19   106, 118).

20   _____

21           [6]When there are conflicting medical assessments by two physicians whose opinions are
     entitled to equal weight, it is within the ALJ's discretion to resolve the conflict.  See Thomas,

22   278 F.3d at 956-57.  Even where two treating physicians disagree, however, the ALJ must still
     articulate specific, legitimate reasons that are supported by substantial evidence in the record for

23   adopting the opinion of one treating physician over another.  See Lester, 81 F.3d at 830-31.

24
             [7]"Muscular dystrophy" refers to "any of a group of hereditary diseases characterized by

25   progressive wasting of muscles."  "Myasthenia gravis" is "a disease characterized by progressive
     weakness and exhaustibility of voluntary muscles without atrophy or sensory disturbance and

26   caused by an autoimmune attack on acetylcholine receptors at neuromuscular junctions."  See

27   http://www.merriam-webster.com/medical/ musculardystrophy, and http://www.merriam-
     webster.com/medical/myastenia+gravis (last visited Oct. 15, 2009).  An electrodiagnostic study

28   on plaintiff's lower extremities dated May 24, 2006, did not demonstrate "any convincing
     evidence of neuropathy or myopathy."  (AR 227-28).

                                          7

1    Plaintiff underwent two neurological evaluations by Dr. Sarah Maze on
2  January 18, 2006 and February 7, 2007.  (AR 110-14, 182-86).  Plaintiff and his
3  wife provided information to Dr. Maze through an interpreter who Dr. Maze noted
4  was "suboptimal."  (AR 110).  Dr. Maze did not have any medical records to
5  review at the time of her first evaluation.  (AR 110).  It appears that the language
6  barrier and lack of medical records for Dr. Maze's review may have been an issue,
7  since Dr. Maze incorrectly noted at the time of her first evaluation that neither
8  plaintiff nor his wife had discussed plaintiff's muscle problems with a physician.[8]
9  (AR 110).  As summarized above, by that time plaintiff had already seen Dr.
10  Akhtar and had been referred for a neurological exam.  (AR 95).

11    Dr. Maze noted that plaintiff's intellectual functioning was difficult to
12  assess/explain, and ultimately concluded that plaintiff's responses to her questions
13  were consistent with poor cooperation.[9]  (AR 111, 113).  Dr. Maze also noted that
14  plaintiff gave an unusual history of having episodes of weakness in his arms and
15  legs, with the cause unclear.  (AR 112-13 (observing "[t]here are objective
16  ///
17  ///
18
19
20    [8]Dr. Maze also reported that plaintiff's history was obtained through plaintiff's wife via
21  the interpreter who had "some difficulty communicating nuances of the English language,"
   limiting the examination.  (AR 113).
22    [9]Dr. Maze noted:
23
24  When he is asked to name the U.S. President he does not respond.  When he is
   asked to give the current year he does not respond.  When he is asked to give his
25  home address he gives the name of the city, but [sic] the state or street number.
   [¶]  Because he gives such unusual responses he is evaluated for malingering.  He
26  is asked to give the shape of a ball and he moves his finger without speaking.
   When he is asked to give the color of the sky he responds, "blue."  He does give
27  his first and last name, but he cannot give his home address or the year.  Mr. Yang
   is asked the colors in the U.S. flag and he does not know.
28
(AR 111).

8

1  findings")).  Dr. Maze ultimately opined that plaintiff had no functional

2  limitations.[10]  (AR 113-14).

3      When plaintiff returned to Dr. Maze in 2007, she noted that plaintiff

4  complained of leg weakness and had seen another neurologist and undergone a

5  muscle biopsy the week before the evaluation.  (AR 182).  Dr. Maze noted that the

6  other neurologist, whose records are not a part of the administrative record, had

7  some concerns that plaintiff's children may also have a muscle disorder.  (AR

8  182).  Plaintiff reported that when he experienced weakness, which occurred about

9  once per month, plaintiff could not stand and required assistance dressing and

10  toileting, and must remain in bed.[11]  (AR 182).  The cause of plaintiff's reported

11  leg weakness was still undetermined.  (AR 182).

12      Although plaintiff's strength then was normal and plaintiff had no muscle

13  atrophy or involuntary movements, plaintiff had some unsteadiness and stiffness

14  in his legs.[12]  (AR 183, 185).  Dr. Maze opined that plaintiff suffered from

15  "transient leg weakness," explaining:

16          He has weakness with hip flexors and depressed reflexes.  There is

17          some waddling gait with some swaying of the pelvis with each step.

18          It is possible that this is a presentation of progressive muscle disorder.

19

20      [10]State agency physician, Dr. A.S. Wong, noted that Dr. Maze's initial evaluation was

21  "not as valuable as it could be" because Dr. Maze was not aware of plaintiff's abnormal

22  laboratory data.  (AR 118).

23      [11]Plaintiff's wife similarly testified that when plaintiff experiences muscle stiffness and/or

24  weakness, he is unable to move and she has to provide all his care.  (AR 247-48).

25      [12]Plaintiff was 62 inches tall and weighed 244 pounds.  (AR 183).  These measurements
yield a body mass index ("BMI") of 44.6, rendering him extremely obese.  See Social Security

26  Ruling 02-1p.  Dr. Maze did not note any limitations in plaintiff's functional ability based on his
apparent obesity.  Elsewhere in the record plaintiff's morbid obesity is reported.  (AR 195).  On

27  remand, the Administration should consider the effect (if any) of plaintiff's obesity, in
combination with his other impairment(s), on his ability to work.  See Celaya v. Halter, 332 F.3d

28  1177 (9th Cir. 2003); Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005); Social Security Ruling
02-1p.

1   Findings are minimal.  Possibilities include limb girdle type muscular

2   dystrophy since his children have apparently been thought to have

3   muscle disease, but his would not be expected to come and go.  [¶]  It

4   appears that there is indeed some progression in problems with motor

5   and coordination functioning.

6   (AR 185).  Dr. Maze opined that plaintiff could lift 25 pounds occasionally and 10

7   pounds frequently, could stand and walk for two hours and sit for six hours out of

8   an eight-hour day with normal breaks, but could not climb ladders or scaffolding.

9   (AR 186; see also AR 189-95 (State agency physician's Physical Residual

10  Functional Capacity Form and accompanying notes, noting similar limitations)).

11  Dr. Maze did not indicate whether plaintiff's leg weakness would interfere with

12  his ability to complete a normal work week.  (AR 186).

13      Plaintiff underwent a psychiatric evaluation by Dr. Romualdo Rodriguez on

14  March 5, 2006.  (AR 119-24).  Plaintiff and a friend, Payai Yang, provided

15  information to Dr. Rodriguez through an interpreter.  (AR 119).  Plaintiff

16  complained of "paralysis" and described his mood as depressed.  (AR 119, 122).

17  Like Dr. Maze's evaluation, Dr. Rodriguez's report notes that plaintiff was

18  "extremely difficult" to interview through an interpreter.[13]  (AR 120).  Dr.

19  Rodriguez observed that plaintiff's face was swollen and plaintiff "appear[ed] to

20  be in some kind of fog," described as "a sense of heaviness, fog, and paralysis."

21  (AR 120-21, 123).  There was "clear psychomotor retardation."  (AR 121).  Dr.

22  Rodriguez noted there was no evidence of exaggeration or manipulation.  (AR

23  _____

24      [13]Dr. Rodriguez explained:

25      This is an extremely difficult interview to conduct through an interpreter.  Even

26      through an interpreter, simple questions involve an extremely long conversation
        back and forth between the claimant and the interpreter.  Even when asked today's

27      date, it seemed as if the interpreter was trying to explain it several times over
        before the claimant would state, "I don't know," through the interpreter.

28

(AR 120).

1    121).  Ultimately, Dr. Rodriguez did not render a diagnosis or provide a functional

2    assessment of plaintiff's mental limitations, explaining:

3              The conclusion is that this claimant has some kind of medical

4              problem which could be anemia, thyroid, cancer, brain tumor, or

5              almost anything.  Slow mentation, being in a fog, and a swollen face

6              can be seen in hypothyroid myxema.  However, this picture can be

7              cause by a very long list of medical and/or neurological problems.  It

8              is impossible to make any kind of psychiatric conclusions at this time,

9              until a clear picture develops.  This means that a detailed medical

10             evaluation with full labs and a detailed neurological evaluation are

11             necessary to find out what is going on with this claimant.

12   (AR 123).  It does not appear that Dr. Rodriguez reviewed any of the records from

13   plaintiff's visits to Dr. Akhtar.  (AR 120).  In a letter dated March 30, 2006, Dr.

14   Rodriguez indicated that plaintiff's psychiatric prognosis was unknown, "since the

15   reason for his swollen face and unresponsiveness is unknown or undiagnosed,"

16   and opined that plaintiff is "unable to do simple and complex work" and was

17   otherwise "markedly limited."  (AR 130-31).

18         Meanwhile, plaintiff continued to see Dr. Akhtar for treatment from January

19   2006 through November 2007.  (AR 203-32).  Plaintiff complained of leg

20   weakness, right knee pain, and right shoulder pain.  (AR 203, 208, 215, 220-21,

21   225, 230).  Throughout these visits plaintiff had abnormal blood test results but

22   normal right knee xrays.  (AR 205-07, 210-13, 214, 221-24).  In March 2007, Dr.

23   Ahktar explained to plaintiff "the conclusion of MD" (muscular dystrophy). (AR

24   209).

25         At the request of plaintiff's counsel, Dr. Ahktar completed a "Medical

26   Opinion Re: Ability to Do Work-Related Activities (Physical)" form on October

27   22, 2007.  (AR 200-02, 204).  Dr. Akhtar noted medical findings of idiopathic

28   intermittent hypokalemia, muscular weakness of both legs, and pain in the lower

11

1  extremities and back ache.  (AR 201).  Dr. Akhtar assessed plaintiff as able to

2  stand and walk less than two hours in an eight-hour day, and able to sit about two

3  hours in an eight-hour day, and must change positions and walk every 30

4  minutes.[14]  (AR 200-01).  Dr. Akhtar opined that plaintiff would be absent from

5  work more than three times per month, noting that plaintiff's condition is

6  "unpredictable and intermittent."  (AR 202).

7           **3.    Analysis**

8           Plaintiff alleges that the ALJ materially erred in rejecting the Dr. Akhtar's

9  October 22, 2007 residual functional capacity assessment.  This Court agrees.

10  Because Dr. Akhtar's residual functional assessment contradicted Dr. Maze's

11  earlier assessment, the ALJ was required to offer "specific, legitimate reasons" for

12  rejecting Dr. Akhtar's 2007 assessment.  Orn, 495 F.3d at 632.  The ALJ rejected

13  Dr. Akhtar's assessment, finding:  (1) the level of dysfunction indicated is

14  "inconsistent with the examining physician opinions indicating less restrictive

15  exertional limitations"; (2) there is no indication that plaintiff's treatment with

16  potassium supplements has failed nor is there any indication of a change of

17  plaintiff's treatment regimen; (3) Dr. Akhtar's opinion that plaintiff would be

18  absent from work more than three times per month contradicted what plaintiff had

19  reported to Dr. Maze in January 2006, i.e., that plaintiff's  "episodes" occurred

20  only once per month; and (4) Dr. Akhtar's opinions were "inordinately based upon

21  plaintiff's subjective complaints," which the ALJ found not credible.  (AR 16).

22  The ALJ's stated reasons are insufficient.

23  _____

24       [14]This finding, if accepted, suggests an inability to do sedentary work, since sedentary
    work requires walking and standing occasionally (i.e., generally no more than two hours out of
25  an eight hour day), and sitting a total of about six hours out of an eight hour day.  See SSR 96-9p.
    The court notes that Social Security rulings are binding on the Administration.  See Terry v.
26  Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990).  Such rulings reflect the official interpretation
    of the Social Security Administration and are entitled to some deference as long as they are
27  consistent with the Social Security Act and regulations.  Massachi v. Astrue, 486 F.3d 1149,
    1152 n.6 (9th Cir. 2007).
28

1    First, the mere fact that other examining physicians found lesser limitations
2    than Dr. Akhtar is not, in itself, a specific, legitimate reason sufficient for rejecting
3    Dr. Akhtar's opinion.  The ALJ must do more by explaining why the conflicting
4    opinions are correct based on substantial evidence in the record.  Orn, 495 F.3d at
5    632; Embrey, 840 F.2d at 421-22.

6    Second, the fact that plaintiff received limited treatment with potassium
7    supplements (and the record does not show additional treatment) is also not a
8    legitimate reason for rejecting Dr. Akhtar's opinion.  The record contains no
9    medical expert opinion detailing what treatment, if any, is available for the kind of
10    muscle weakness found by both Dr. Akhtar and Dr. Maze.  The ALJ is not a
11    medical expert, and his opinion could not substitute for a medical expert's opinion
12    on the issue of whether plaintiff's limited treatment has or has not "failed." See
13    Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975); see also Allen v. Astrue,
14    2009 WL 3244731 *4 (C.D. Cal. Oct. 7, 2009) (citing cases).  Moreover, the
15    record suggests that plaintiff's treatment *has* failed.  The record contains
16    consistent reports that plaintiff continued to suffer from his muscle weakness
17    despite any supplements he may have been given.

18    Third, the fact that Dr. Akhtar opined that plaintiff would be absent more
19    than three times per month when plaintiff earlier had reported suffering from his
20    "episodes" once per month is not a legitimate reason to reject Dr. Akhtar's
21    opinion.  Plaintiff's report to Dr. Maze eight months earlier that his "episodes"
22    occurred "about once per month" does not necessarily conflict with Dr. Akhtar's
23    opinion.  As noted above, Dr. Maze did not offer an opinion on how often plaintiff
24    may suffer from his "transient leg weakness."  While the fact that a treating
25    physician's opinion that conflicts with a claimant's own report may be a legitimate
26    reason to reject the treating physician's opinion, Lester, 81 F.3d at 831, given the
27    noted problems with plaintiff's intellectual functioning and ability to communicate
28    with his examiners, plaintiff's report to Dr. Maze a number of months before Dr.

13

Akhtar's opinion is not a legitimate reason to reject Dr. Akhtar's opinion
wholesale.  For example, plaintiff's report to Dr. Maze concerning the number of
times he suffered from his "episodes" per month certainly is not a reason to reject
Dr. Akhtar's opinion that plaintiff would be unable to stand and sit as required for
sedentary work.

Finally, the ALJ's assertion that Dr. Akhtar's opinions were based
"inordinately" on plaintiff's subjective complaints is not consistent with the
record.  As summarized above, the record contains objective indications of
plaintiff's muscle weakness, including abnormal laboratory results, Dr. Maze's
observations concerning plaintiff's weakness with hip flexors, depressed reflexes,
waddling gait, and notation regarding other "objective findings," and Dr.
Rodriguez's observations concerning plaintiff's physical appearance and the need
for a complete physical examination to determine the cause of plaintiff's
limitations.  Given the objective evidence of plaintiff's muscle weakness, the
ALJ's rejection of Dr. Akhtar's opinion as based inordinately on plaintiff's
subjective complaints cannot stand.

**B.      If the ALJ Questioned the Basis of the Treating Physician's
         Opinion The ALJ Should Have Further Developed the Record**

An ALJ has an affirmative duty to assist the claimant in developing the
record at every step of the sequential evaluation process.  Bustamante, 262 F.3d at
954; see also Webb v. Barnhart, 433 F.3d at 687.  The ALJ's duty exists whether
or not plaintiff is represented by counsel.  Tonapetyan v. Halter, 242 F.3d 1144,
1150 (9th Cir. 2001).  The ALJ's duty is triggered "when there is ambiguous
evidence or when the record is inadequate to allow for proper evaluation of the
evidence." Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001) (citation
omitted).

"[B]ecause treating source evidence (including opinion evidence) is
important, if the evidence does not support a treating source's opinion on any

14

1   issue reserved to the Commissioner and the adjudicator cannot ascertain the basis
2   of the opinion from the case record, the adjudicator must make 'every reasonable
3   effort' to recontact the source for clarification of the reasons for the opinion."
4   Social Security Ruling ("SSR") 96-5p.  An ALJ may discharge his duty to develop
5   the record in several ways, including:  subpoenaing the plaintiff's physician,
6   submitting questions to the physician, continuing the hearing, or keeping the
7   record open after the hearing to allow supplementation of the record.  Tonapetyan,
8   242 F.3d at 1150 (citations omitted).  In plaintiff's case, the ALJ did none of these
9   things.
10          If the ALJ questioned the basis for Dr. Akhtar's opinion, or plaintiff's
11   apparent lack of treatment for his condition, the ALJ should have inquired of Dr.
12   Akhtar before rejecting Dr. Akhtar's opinion.  Smolen v. Chater, 80 F.3d 1273,
13   1288 (9th Cir. 1996); 20 C.F.R. § 416.912(e).  Whether Dr. Akhtar based his
14   opinion on sufficient objective clinical findings or solely on plaintiff's properly-
15   discredited subjective complaints is a material question, but a question that the
16   ALJ should have afforded Dr. Akhtar an opportunity to answer and explain.

17   **V.     CONCLUSION**
18          For the foregoing reasons, the decision of the Commissioner of Social
19   Security is reversed in part, and this matter is remanded for further administrative
20   action consistent with this Opinion.[15]
21          LET JUDGMENT BE ENTERED ACCORDINGLY.
22   DATED: October 22, 2009                    _____/s/_____

23                                              Honorable Jacqueline Chooljian
                                                UNITED STATES MAGISTRATE JUDGE
24

25          [15]The Court need not and has not reached any other issue raised by plaintiff except insofar
26   as to determine that plaintiff's suggestion of reversal rather than remand is unpersuasive.  When
     a court reverses an administrative determination, "the proper course, except in rare
27   circumstances, is to remand to the agency for additional investigation or explanation."
28   Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and
     quotations omitted).  Remand is proper where, as here, additional administrative proceedings
     could remedy the defects in the decision.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir.
     1989).